Filed 12/17/25  P. v. Olaez CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D086350 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. BAF1701332) |
| DANIEL NESTOR OLAEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside, Rene Navarro, Judge.* Affirmed.

Rachel Varnell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Heather B. Arambarri, Deputy Attorneys General, for Plaintiff and Respondent.

---

* Retired Judge of the San Diego Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# I

## INTRODUCTION

A jury found appellant Daniel Nestor Olaez guilty of committing thirteen sex crimes against his girlfriend's two minor daughters over the span of three years. The trial court sentenced Olaez to an aggregate state prison term of 275 years to life, plus three years.

On appeal from the judgment of conviction, Olaez raises the following claims of error: (1) insufficient evidence supported the jury's factual findings that he used duress to commit the sex acts giving rise to nine of his convictions; (2) the trial court erred by admitting into evidence any expert testimony on child sexual abuse accommodation syndrome (CSAAS), and specifically, expert testimony on the percentage of children who wait until adulthood to report sexual abuse; (3) his constitutional right to due process was violated because the prosecution did not provide him with fair notice that it intended to seek prison terms of 25-years-to-life for eleven of his offenses; and (4) his sentence constituted cruel and/or unusual punishment in violation of the federal and state constitutions.

We reject Olaez's arguments, all of which are forfeited, meritless, or both. Therefore, we affirm the judgment.

# II

## BACKGROUND

In 2023, the Riverside County District Attorney filed a fourth amended information—the operative information at trial—charging Olaez with two counts of rape of a child under 14 years of age by use of force, violence, duress, menace, or fear (Pen. Code,[1] § 269, subd. (a)(1); counts 1 & 2); two counts of sexual penetration of a child under 14 years of age by use of force,

---

[1] Further undesignated statutory references are to the Penal Code.

violence, duress, menace, or fear (*id.*, subd. (a)(5); counts 3 & 4); two counts of oral copulation of a child under 14 years of age by use of force, violence, duress, menace, or fear (*id.*, subd. (a)(4); counts 5 & 6); four counts of committing a lewd or lascivious act upon a child under 14 years of age by use of force, violence, duress, menace, or fear (§ 288, subd. (b)(1); counts 7, 8, 12, & 13); sexual intercourse by use of force, violence, duress, menace, or fear (§ 261, subd. (a)(2); count 9); oral copulation by use of force, violence, duress, menace, or fear (former § 288a, now § 287; count 10); and one count of committing a lewd or lascivious act upon a child who is 14 or 15 years of age (§ 288, subd. (c)(1); count 11).

For each charge, except count 11, the fourth amended information alleged Olaez committed a qualifying sex offense against more than one victim under the One Strike Law, section 667.61. (§ 667.61, subd. (e)(4).) It also alleged two aggravating circumstances: (1) one of the victims, J.S., was particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)); and (2) Olaez took advantage of a position of trust or confidence to commit the offenses (*id.*, rule 4.421(a)(11)).

A. *Prosecution Case*

In 2013, Olaez moved into a condominium in Hemet with his girlfriend, J.H., and her three daughters, J.S., S.S., and A.S. At the time, J.S. was ten years old, S.S. was eight years old, and A.S. was six years old. J.H. was also pregnant with a fourth child and Olaez was the child's biological father. Olaez regularly watched over J.H.'s daughters when J.H. was at work, and the girls regarded him as a father figure.

1. *Crimes Against J.S. (Counts 1–11)*

J.S. was twenty years old when she testified about the sexual abuse Olaez perpetrated against her when she was a minor.

Olaez began sexually abusing J.S. when she was 11 years old. The first time he abused her, she was watching a movie in the living room and laying on the couch with her legs resting on his lap. He started rubbing the lower portion of her legs underneath her pajama pants and moved up to her thighs. He then moved his hand to her vagina, rubbed and touched her clitoral area, inserted his finger in her vagina, and moved his finger back and forth. After he stopped, she told him not to do it again. He apologized and said he would never do it again.

On another occasion, Olaez asked J.S. to give him a lap dance while they were in the garage. She asked him what a lap dance was, and he described it for her. She then gave him a lap dance while facing away from him. He touched her body over her clothing and she felt his erect penis pressed against her buttocks.

Olaez sometimes left the family home and drove elsewhere with J.S. to sexually abuse her. He asked her if she wanted to drive somewhere like the grocery store, and she agreed, but he instead drove them down an isolated road, parked the car, and touched her. He usually rubbed her clitoral area beneath her underwear and placed his fingers in her vagina. He also placed her hand on his erect penis and moved her hand up and down, and she believed he sometimes ejaculated. She estimated he did this to her between five and ten times when she was 11 or 12 years old.

Olaez also began having sexual intercourse with J.S. when she was 11 or 12 years old. The first time he had sex with her was in the backseat of a car parked in the family's garage. He told her, "Let me do this." She asked him why, and he said, "Because I want to." She did not resist him because he had a temper and she believed he would get mad if she argued with him. J.S. had seen him engage in verbal and physical confrontations with her mother

4

and she worried he would fight with her mother if she refused him. J.S. experienced pain the first time they had sex and her vagina bled for a few hours afterwards.

Over the course of three years, Olaez regularly had sex with J.S. in several locations including the garage, the car, her bedroom, and her mother's bedroom. She was 14 years old the last time he had sex with her. On that occasion, he asked her to wear a skirt with no underwear and come out to the garage. When she complied, he bent her over a chair and had sex with her.

Olaez orally copulated J.S. at least 20 times in the house and garage when she was between the ages of 12 and 14 years old. When she was 13 years old, he put his penis down the back of her pants and ejaculated into her pants. He once asked her to put her mouth on his penis, but she refused.

During the three-year span of abuse, J.S. often told Olaez she did not want to have sex or engage in sex acts with him, but she was afraid of his temper and worried he would fight with her mother if she refused him. He regularly warned her not to disclose the abuse to others, particularly her mother, because the disclosure would sadden her mother and get him in trouble.

2. *Crimes Against S.S. (Counts 12–13)*

S.S. was 18 years old when she testified about the sexual abuse Olaez perpetrated against her when she was a minor.

As noted, S.S. was eight years old when Olaez began living with S.S. and her family. For the first few years, S.S. viewed him as a father figure. However, by the time she was eleven years old, she did not like him because he was aggressive, violent, and "handsy" with her and her mother.

When S.S. was eleven years old, Olaez began to tease and roughhouse with her. During the roughhousing, he sometimes used one of his arms to wrap around her and pin her arms down to her sides while he squeezed one of her breasts with his free hand. He usually groped her breasts over her clothing, but he occasionally groped her under her clothing and over her bra. Initially, she tried pulling away from him and telling him "no." However, after a few months, she stopped resisting and let him grope her because, in her words, she was "tired of fighting."

During the same timeframe, Olaez regularly told S.S. that she was sexy, and he wanted to touch her. Once, he handed her his cell phone, which had pornography on it, and said, "Oops. Didn't mean for that to show up."

Olaez frequently told S.S. the abuse was a secret, and no one would believe her if she disclosed it. She was afraid to disclose his misconduct because she believed no one would listen or believe her. She was also afraid he would hurt her mother if she disclosed the abuse.

The last time Olaez sexually abused S.S., he walked into her bedroom while she was lying on her bed and reading a book. He asked her about the book, sat down on the bed as she explained the book, and then grazed her genital area over her clothes with his hand for a few seconds. She became upset, got off the bed, and threw a rollerblade at him. Olaez laughed and left the room.

After the last instance of sexual abuse, S.S. told her mother she wanted to live with her biological father over the summer. A few weeks later, S.S. moved in with her father in San Diego.

3. *Disclosure of the Sexual Abuse*

In late summer 2017, about a month after S.S. went to live with her father, J.H. found and read a diary S.S. had left behind in her bedroom. S.S.

6

had deliberately left the diary in the hopes someone would find it. The diary included four entries—two from February 2017, and two from June 2017.

In an entry dated June 14, 2017, S.S. wrote, " '[Olaez] continuously says things that he shouldn't say. Example. "I'm gonna grab you. I'm gonna grab your boob. I was gonna do something, but, no, because you'd like it too much." Looks at my boobs. Grabs my boobs. And I called him a dick right now, and he said, "You should suck it." I don't want to live here anymore. I don't want to live. This has been going on for a while. … [¶] One time he even came into my room while my mom was gone. This always occurs when she's not home, and he touched my girl parts over my clothes. [¶] Mom says not to call him a perv. I don't know what to do. I can't tell because that could hurt more than intended, and I have definitely thought of death as an option if it comes to it. I can either move out or die. That's my option."

After J.H. read the diary, J.H. called S.S. at her father's house and asked her if the entry about Olaez was true. S.S. shut down emotionally and declined to answer her mother's questions. J.H. ended her relationship with Olaez shortly after reading S.S.'s diary.

In November 2017, J.H. read through J.S.'s text messages on her cell phone and learned J.S. was having sex with her boyfriend. When J.H. confronted J.S. about the text messages, J.S. told J.H. it "didn't matter," because Olaez had abused her and she was no longer a virgin. J.H. contacted the police soon after J.S.'s disclosure.

4. *CSAAS Evidence*

Dr. Jody Ward, a clinical and forensic psychologist, testified at trial as an expert on child sexual abuse accommodation syndrome, or CSAAS. Child sexual abuse accommodation refers to the pattern of behaviors—sometimes

7

counterintuitive behaviors—that are often exhibited by children who have been sexually abused.

According to Dr. Ward, studies have shown that two-thirds of people who report childhood sexual abuse delay their disclosure until adulthood, while one-third reports the sexual abuse during childhood. She testified that children delay reporting because they fear they will be blamed for the abuse or disbelieved, or they fear their disclosure will break up their family or peer group. She also testified that children who are abused by a stranger tend to report earlier than children who are abused by someone with whom they have an ongoing relationship because children in the latter category harbor "love and loyalty toward the abuser." Further, when the perpetrator has an ongoing relationship with the child, the abuse tends to be more gradual and can occur over a more sustained timeframe, which can also delay disclosure. According to Dr. Ward, the average reporting delay is 11 years.

Dr. Ward testified that children who disclose sexual abuse do not tend to remember every detail of the abuse for several reasons, including the fact that memories tend to fade over time, abuse tends to follow a pattern and can cause children to group individual memories together, children do not have a developed sense of time, and children do not have an advanced vocabulary to describe abuse. She testified that children who disclose abuse tend not to disclose all the details of the abuse at once and instead "test the waters" through partial disclosure to see how the listener will respond. She also testified that children may omit details when they disclose abuse because they dissociate during the abuse or strive to forget the details as a coping mechanism. According to Dr. Ward, inconsistencies in incremental disclosures are to be expected and do not necessarily mean the reporting party is being untruthful.

8

B. *Defense Case*

Olaez testified in his own defense. He claimed he bonded with J.S. and S.S., and had a good relationship with them, until they started spending more time with their biological father. After they started spending time with their father, J.S. distanced herself from Olaez and S.S. became rude and aggressive. Olaez denied sexually abusing either girl.

The defense introduced into evidence several letters, drawings, and poems J.S. and S.S. sent to Olaez while he was in custody for offenses unrelated to the sex crimes that he perpetrated against them. In those correspondence, which predated the girls' disclosure of the sexual abuse, the girls expressed that they loved and missed Olaez.

The defense also elicited testimony from Olaez's brother, sister, and son. Olaez's brother testified that Olaez was not a person "given to lewd conduct with children." Olaez's sister, who sometimes babysat J.S. and S.S., never saw Olaez engage in inappropriate sexual conduct with the girls. Olaez's son, who lived with Olaez, J.H., and her daughters for a few months, never witnessed anything to make him suspect that there was any "unwanted or untoward physical touching," or that Olaez was "given towards lewd or unwanted conduct towards children."

C. *Verdict and Sentencing*

The jury found Olaez guilty of all the charged offenses, except it acquitted him on count 9 (sexual intercourse by use of force, violence, duress, menace, or fear) and convicted him on the lesser included offense of battery (§ 242). The jury also returned true findings on all the multiple-victim allegations. After a bifurcated proceeding, the jury found both aggravating circumstances true as well.

9

The trial court sentenced Olaez to an aggregate prison term of 275 years to life, plus three years, which it calculated as follows: the upper term of three years for count 11, plus 11 consecutive terms of 25 years to life for each of counts 1 through 8, 10, 12, and 13, plus a concurrent term of 180 days for count 9.

## III

## DISCUSSION

A. *Substantial Evidence Supported the Jury's Factual Findings of Duress for Counts 1–8 and 10*

Olaez challenges the sufficiency of the evidence underpinning his convictions for counts 1 and 2 (forcible rape of J.S.), counts 3 and 4 (forcible sexual penetration of J.S.), counts 5, 6, and 10 (forcible oral copulation of J.S.), and counts 7 and 8 (forcible lewd acts upon J.S.). He does not dispute that he committed the sex acts giving rise to his convictions. Rather, he contends there was insufficient evidence to support the jury's implied factual findings that he used *duress* to accomplish the sex acts. We disagree.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] This determination 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Cardenas* (2025) 18 Cal.5th 797, 832.) " 'We must also "accept logical inferences that the jury might have drawn from the circumstantial

10

evidence.' " [Citation.] We do not question the credibility of a witness's testimony, so long as it is 'not inherently improbable,' nor do we reconsider the weight to be given any particular item of evidence." (*People v. Navarro* (2021) 12 Cal.5th 285, 302.) "The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts." (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589.)

To sustain the convictions for counts 1 through 8, and count 10, the prosecution was required to prove, beyond a reasonable doubt, that Olaez committed the crimes by use of force, violence, duress, menace, or fear. (§§ 261, subd. (a)(2), 269, subd. (a)(1) [counts 1 & 2]; §§ 269, subd. (a)(5), 289, subd. (a) [counts 3 & 4]; § 269, subd. (a)(4), former § 288a, subd. (c)(2)(C), § 287, subd. (c)(2)(C) [counts 5 & 6]; § 288, subd. (b)(1) [counts 7 & 8]; former § 288a, subd. (c)(2)(C), now § 287, subd. (c)(2)(C) [count 10].) The prosecution tried the case on the theory that Olaez committed the crimes by use of duress. The parties' appellate briefs similarly focus on the element of duress.

For purposes of counts 1 and 2 (forcible rape), " '[d]uress' means a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted." (§ 261, subd. (b)(1).) Duress has a virtually identical definition for purposes of counts 3 and 4 (forcible sexual penetration), counts 5, 6, and 10 (forcible oral copulation), and counts 7 and 8 (forcible lewd act), except it includes a threat of hardship in addition to the other types of threats just noted. (*People v. Leal* (2004) 33 Cal.4th 999, 1004 [defining duress for forcible lewd act statute]; *People v. Senior* (1992) 3 Cal.App.4th 765, 775 [defining duress for forcible oral

11

copulation and forcible sexual penetration statutes].) "[T]he legal definition of duress is objective in nature and not dependent on the response exhibited by a particular victim." (*People v. Soto* (2011) 51 Cal.4th 229, 246.) "Because duress is measured by a purely objective standard, a jury [can] find that the defendant used threats or intimidation to commit a [sex] act without resolving how the victim subjectively perceived or responded to this behavior." (*Ibid.*)

"'The total circumstances, including the age of the victim, and [her] relationship to defendant are factors to be considered in appraising the existence of duress.'" (*People v. Barton* (2020) 56 Cal.App.5th 496, 518; see § 261, subd. (b)(1); see also *People v. Schulz* (1992) 2 Cal.App.4th 999, 1005 ["Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes."].) "'Other relevant factors include threats to harm the victim, physically controlling the victim when the victim attempts to resist, and warnings to the victim that revealing the molestation would result in jeopardizing the family.' [Citation.] 'The very nature of duress is psychological coercion. A threat to a child of adverse consequences, such as suggesting the child will be breaking up the family or marriage if she reports or fails to acquiesce in the molestation, may constitute a threat of retribution and may be sufficient to establish duress.'" (*Barton*, at p. 518.)

Viewing the evidence in the light most favorable to the judgment, we conclude there was substantial evidence that Olaez used duress to perpetrate the sex crimes at issue. Olaez was 48 years old when he began sexually abusing J.S., who was just 11 years old at the time. She viewed him as a father figure and, in fact, he was the biological father of her younger half-sibling. Olaez lived with J.S. and her family, watched J.S. and her sisters

12

when their mother was away, and used his position of trust and authority in the household to continually and repeatedly abuse her over many years. According to J.S., Olaez told her "[n]ot to tell [her] mom" most times that he abused her. He warned her that she "would get him in trouble," and make her mother sad, if she disclosed the abuse. She also recalled him once saying something like, "You won't do anything. You can't do anything."

Olaez also took J.S. to isolated locations to molest her. She testified he regularly asked her to accompany him on car rides and used those opportunities—while she was alone and defenseless—to drive to remote areas, park his vehicle, and touch her genital area and/or force her to touch his penis. She testified he orally copulated her, compelled her to touch his penis, and raped her in other secluded locations like the garage, where she was vulnerable to his advances and sequestered from the rest of her family.

J.S. also testified that Olaez had a bad temper and "start[ed] fights with [her] mom all the time." She testified the fights were verbal and physical, and "[h]e would pull her [mother's] hair or hit her." Olaez himself corroborated J.S.'s testimony, admitting on the witness stand that he argued with J.H. and fought, pushed, and got physical with her. According to J.S., she feared Olaez would get mad and "tak[e] it out on" her mother if she resisted his unwanted sexual advances.

Considering this evidence in its totality, a reasonable jury could find that Olaez—a father figure to J.S. and member of the family household— used duress to accomplish the sex acts. A rational jury could find that Olaez's quick temper and history of perpetrating violent acts against J.H. gave rise to an implied threat of retribution or harm to J.H. if J.S. did not succumb to his advances. (See *People v. Torres* (2024) 107 Cal.App.5th 513, 536 [evidence supported finding of duress where victim feared father's

13

aggression and "was concerned he could act the same way if she actively resisted his sexual advances"]; *People v. Thomas* (2017) 15 Cal.App.5th 1063, 1073 ["The jury could reasonably have found that [defendant's] continual beatings constituted an implied threat of violence or danger if [victim] did not submit to his sexual abuse."]; *People v. Garcia* (2016) 247 Cal.App.4th 1013, 1024 ["After defendant had repeatedly threatened to harm [victim's] mother, all of his subsequent acts of abuse were facilitated by the duress engendered by these threats."].)  Further, a jury could reasonably infer an implied threat of hardship or retribution when Olaez suggested J.S. would sadden her mother and get him in trouble, resulting in a possible breakdown of the family, if she did not submit to him and maintain his secrecy.  (See *People v. Townes* (2025) 108 Cal.App.5th 603, 613 ["suggesting to a child that reporting molestation or refusal to acquiesce to it may lead to a family breakup ... may constitute a threat of retribution sufficient to establish duress"].)

Viewing the evidence in the light most favorable to the judgment, we conclude that the totality of the evidence supported the jury's factual findings of duress for counts 1 through 8, and count 10.[2]

---

[2]  Olaez relies on *People v. Espinoza* (2002) 95 Cal.App.4th 1287, to support his claim that the evidence was insufficient to support the jury's findings of duress.  *Espinoza* is distinguishable.  In that case, the appellate court concluded there was insufficient evidence of duress where a father molested his 12-year-old daughter, who had limited intellectual faculties, on five occasions.  (*Id.* at pp. 1318–1322.)  The court reasoned, "No evidence was adduced that defendant's lewd act and attempt at intercourse were accompanied by any 'direct or implied threat' of any kind.  While it was clear that [the victim] was afraid of defendant, no evidence was introduced to show that this fear was based on anything defendant had done other than to continue to molest her."  (*Id.* at p. 1321.)  Here, by contrast, there *was* evidence of an implied threat independent of the sex acts themselves— evidence that Olaez was quick to anger, he was violent with J.S.'s mother, and he repeatedly warned J.S. not to disclose the abuse.

14

B. *The Trial Court Properly Admitted the CSAAS Evidence*

Olaez asks us to reverse his judgment of conviction in its entirety on the ground that the trial court erred when it admitted Dr. Ward's expert CSAAS testimony into evidence. His argument takes two forms. First, he asserts CSAAS evidence is inherently unreliable, and the court thus erred when it allowed *any* CSAAS evidence. Second, assuming CSAAS is not categorically inadmissible, he claims the court erred when it permitted Dr. Ward to testify that two-thirds of persons who report childhood sexual abuse delay their disclosure until adulthood and one-third discloses the abuse during childhood. We address these arguments in turn.

1. *CSAAS Evidence Is Not Categorically Inadmissible*

As noted, Olaez asserts the trial court erred by allowing Dr. Ward to testify about CSAAS. He argues CSAAS evidence should be categorically excluded in sexual abuse cases because it is inherently unreliable and, by its very nature, it tends to answer the ultimate question of whether sexual abuse occurred because it supports the credibility of the alleged victim. Citing *People v. McAlpin* (1991) 53 Cal.3d 1289, he acknowledges "California has accepted the admissibility of CSAAS." However, he notes that some courts in out-of-state jurisdictions have disallowed CSAAS evidence,[3] and he claims CSAAS is "no longer an accurate reflection of current understandings of how children respond to abuse."

"Our Supreme Court indicated in *McAlpin* that CSAAS expert testimony is admissible to disabuse jurors of commonly held misconceptions about child sexual abuse victims' behavior and to explain seemingly

---

[3]     *State v. Ballard* (Tenn. 1993) 855 S.W.2d 557, 561–563; *State v. Stribley* (Iowa Ct. App. 1995) 532 N.W.2d 170, 173–174; *Steward v. State* (Ind. 1995) 652 N.E.2d 490, 498–499; *King v. Commonwealth* (Ky. 2015) 472 S.W.3d 523, 528–530; *State v. J.L.G.* (N.J. 2018) 234 N.J. 265, 301–304.

contradictory behavior of a child sexual abuse victim. [Citation.] The California Supreme Court's decisions are binding on all lower courts in this state. [Citation.] 'CSAAS evidence has been admitted by the courts of this state since the 1991 *McAlpin* decision.' [Citation.] 'Further, reviewing courts have routinely held the admission of CSAAS evidence does not violate due process. [Citations.]' [Citation.] Defendant's references to decisions from other jurisdictions that reached a different position do not affect the binding nature of the *McAlpin* decision. ... That other jurisdictions may disagree with it does not change its impact on California cases. [Citation.]' [Citation.] Accordingly, we adhere to precedent from our Supreme Court that CSAAS evidence is generally admissible for the limited purposes for which it was admitted in the instant case." (*People v. Ramirez* (2023) 98 Cal.App.5th 175, 216; see *People v. Sedano* (2023) 88 Cal.App.5th 474, 479 (*Sedano*) ["Expert testimony on CSAAS has long been held admissible in California for the limited purposes of dispelling commonly held myths or misconceptions about child sexual abuse and aiding the jury in 'evaluating the credibility of an alleged child victim of sexual abuse.' "]; *People v. Munch* (2020) 52 Cal.App.5th 464, 472 [California has "long recognized the well-established relevance, necessity, reliability, and importance of [CSAAS] evidence."].)[4]

### 2. *The Trial Court Did Not Err When It Allowed Dr. Ward's Testimony on the Statistic of Delayed Disclosure*

On direct examination, the prosecutor asked Dr. Ward if she was familiar with the concept of delayed disclosure and, after she confirmed her familiarity with the concept, the prosecutor asked her to describe the term. Dr. Ward then testified that delayed disclosure refers to the fact that,

[4]     Our conclusion that CSAAS evidence is not generally inadmissible renders it unnecessary for us to decide whether Olaez forfeited his claim of error by failing to object to the admission of any and all CSAAS evidence.

according to numerous studies conducted over many years, two-thirds of persons who report childhood sexual abuse wait until adulthood to report the abuse, while one-third reports the abuse during childhood.

Shortly after this testimony, defense counsel requested a sidebar and, outside the presence of the jury, stated he did "[not] have a big issue with the child sexual abuse accommodation syndrome testimony," but "we start straying from that when we start getting into percentages of people who do report or don't report." Defense counsel added, "when we get into things like, 'Generally, overall, this percentage of people don't report, this percentage of people report but don't do this or that,' I think that goes beyond an explanation for delayed reporting." The court ruled the defense could "cover that on cross," but the expert testimony did "not violate[] [*People v.*] *Sanchez* [(2016) 63 Cal.4th 665], [did] not violate[] any of the rules with respect to what an expert can testify on with respect to Evidence Code section 800 and 700." Therefore, the court overruled the defense objection, to the extent the defense in fact asserted an objection at all.

On appeal, Olaez claims the trial court erred by admitting Dr. Ward's expert testimony concerning the delayed disclosure statistic because it invaded the province of the jury to assess the credibility of the alleged victims and draw ultimate inferences about the truth of their allegations of abuse. We review the court's ruling on the admissibility of expert testimony for abuse of discretion. (*People v. McDowell* (2012) 54 Cal.4th 395, 425–426.) " 'To establish an abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it "falls outside the bounds of reason." [Citations.] A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.] An abuse of discretion will be "established by 'a showing the trial court exercised its discretion in an arbitrary, capricious, or

17

patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*People v. Johnson* (2022) 12 Cal.5th 544, 605–606.)

Olaez relies on *People v. Wilson* (2019) 33 Cal.App.5th 559 (*Wilson*), and *People v. Julian* (2019) 34 Cal.App.5th 878 (*Julian*), to support his claim of error. In *Wilson*, a defendant convicted of lewd acts against a child challenged the admissibility of expert testimony concerning the frequency of false allegations of child sexual abuse. (*Id.* at pp. 568–572.) After the expert testified about CSAAS, he stated that one study found a false sexual abuse allegation in four percent of cases, while other studies found a false sexual abuse allegation in 1 to 6 percent of cases. (*Id.* at p. 568.) The *Wilson* court ruled this statistical testimony was inadmissible because it "had the effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth." (*Id.* at p. 570.) Although the testimony did not pertain specifically to the alleged victims in the case, "the practical result was to suggest to the jury that there was an overwhelming likelihood their testimony was truthful. In so doing, this testimony invaded the province of the jury, whose responsibility it is to 'draw the ultimate inferences from the evidence.' " (*Ibid.*) Further, insofar as the testimony failed to specify whether the alleged victims fell within the four percent of cases with a false allegation or the ninety-six percent of cases with a true allegation, "[t]he statistical evidence was not relevant, and its admission was more prejudicial than probative." (*Id.* at p. 571.)

Similarly, in *Julian, supra*, 34 Cal.App.5th 878, a defendant convicted of committing lewd acts and sexual penetration against his minor sister challenged the admissibility of an expert's testimony regarding the statistical percentage of false child abuse allegations. (*Id.* at pp. 880–881.) After the expert finished testifying about CSAAS, including the myth that children

18

disclose sexual abuse right away, the expert testified about the separate topic of false child abuse allegations. (*Id.* at pp. 883–884.) He stated that false child abuse allegations are infrequent or rare and, when they occur, they happen most often during custodial disputes. (*Ibid.*) He also stated that the body of empirical research disclosed a false allegation rate as low as one percent and as high as eight percent. (*Id.* at p. 883.) The *Julian* court concluded the expert's false allegation testimony was irrelevant and inadmissible, and deprived the defendant of his right to a fair trial, because it "invited jurors to presume [the defendant] was guilty based on statistical probabilities, and not decide the evidence properly introduced in the case." (*Id.* at p. 886; see *id.* at p. 888 ["it improperly suggested [the defendant] was guilty based on statistical probabilities that were irrelevant to this case"].)

Relying on *Wilson* and *Julian*, Olaez contends Dr. Ward's testimony on the statistic of delayed disclosure invades the province of the jury because it suggests J.S. and S.S. were truthful in their allegations of child abuse. We reject this argument, as the delayed disclosure statistic is "not the sort of statistic[] that ' " 'convey[s] a conclusion concerning defendant's legal guilt.' " ' " (*Sedano, supra*, 88 Cal.App.5th at p. 481.) Unlike the experts in *Wilson* and *Julian*, Dr. Ward "gave no testimony about how frequently or infrequently people make *false allegations* of childhood sexual abuse. Rather, the challenged statistics were regarding … how often abused children delay reporting sexual abuse. These statistics could help the jury assess [J.S. and S.S.'s] credibility in the sense that, if a juror believed [Dr. Ward], they would be less inclined to *disbelieve* [J.S. and S.S.] simply because [they] … did not tell anyone of the alleged abuse [immediately]. These are not statistics that improperly bear on the specific complainant's veracity, as false allegation statistics necessarily do. They are not statistics that 'plac[e] a thumb on the

19

scale *for guilt*.' [Citation.]  Rather, by attempting to dispel [a] common myth[] and misconception[]—that ... victims usually come forward right away—they help the jury objectively 'evaluat[e] the credibility of an alleged child victim of sexual abuse.' [Citations.]  This is precisely what CSAAS testimony is meant to do." (*Sedano,* at p. 481.)

Olaez asserts the delayed disclosure statistic "suggest[ed] to the jury there was an overwhelming likelihood that the testimonies of [the alleged victims] were truthful," because they delayed disclosure of their abuse and, according to Dr. Ward, two-thirds of persons who report child abuse delay disclosure until adulthood.  "This overstates the testimony's potential.  In fact, the testimony was offered to ensure that the jury *did not* conclude that [J.S. and S.S.'s] allegations must be *false* based on adverse assumptions from [their] delay[s] in disclosure.  A classic permissible use of CSAAS evidence is to 'explain the typical behaviors of sexually abused children, such as delayed reporting.' [Citations.]  [Dr. Ward] simply used numerical statistics to explain how 'typical' the behavior of delaying disclosure is.  The use of numbers to demonstrate the prevalence of a certain behavior does not change the fact that the testimony was offered to rebut a specific misconception regarding the import of delayed disclosure—a purpose firmly permitted by the CSAAS case law, dating back to its origin." (*Sedano, supra,* 88 Cal.App.5th at p. 483.)

"A reasonable juror would not draw from this testimony that a delayed disclosure is necessarily a truthful one.  And, making doubly sure the jury did not do so, [Dr. Ward] emphasized ... that CSAAS 'is not a ... diagnostic tool,' " and it cannot be used "to determine whether or not sexual abuse occurred." (*Sedano, supra,* 88 Cal.App.5th at p. 484.)  In fact, she testified that "[n]o behavior after the fact can be used to determine whether sexual abuse

occurred," and she agreed it would be improper to use CSAAS "as proof of [the] credibility of [the] witnesses." For all these reasons, the trial court did not abuse its discretion by allowing Dr. Ward's testimony on delayed disclosure, which fell squarely within the scope of permissible CSAAS evidence.

C. *Olaez Forfeited His Due Process Challenge to the Sentences Imposed for Counts 1–8, 10, 12 and 13*

Next, Olaez contends the court's imposition of prison terms of 25 years to life for several counts (counts 1–8, 10, 12, and 13) violated his right to due process because the fourth amended information did not provide him fair notice of the potential sentences he would receive upon his conviction for those counts. In response, the People claim Olaez forfeited his due process argument by failing to object in the trial court and, furthermore, any error was harmless. We agree with the People that Olaez forfeited his argument.

1. *One Strike Law*

"California's 'One Strike' law, codified at ... section 667.61, is an alternative sentencing scheme that applies when the prosecution pleads and proves specific aggravating circumstances in connection with certain sex offenses." (*In re Vaquera* (2024) 15 Cal.5th 706, 712 (*Vaquera*).) "The law applies when the prosecution pleads and proves specific factual circumstances in addition to the elements of the underlying sex offense. [Citation.] When the prosecution is pursuing sentencing under the One Strike law, the jury decides first whether the prosecution has proved the elements of the charged offense; if the jury convicts, it then independently considers whether the prosecution has proved the circumstances alleged to support sentencing under the One Strike law. [Citation.] [¶] If the prosecution has not pled and proved a One Strike law allegation, the usual, determinate sentence for the sex crime applies." (*Id.* at p. 713.) "When,

21

however, a jury has found true a One Strike law allegation, the offense generally will be punishable by an indeterminate sentence of either 15 years to life or 25 years to life." (*Ibid.*)

Relevant here, subdivision (b) of the One Strike Law mandates a sentence of 15 years to life where a defendant is found to have committed a qualifying sex offense under one of the circumstances specified in subdivision (e). (§ 667.61, subds. (b), (e).) One such circumstance exists when the defendant is convicted in the present case (or cases) of committing a qualifying sex offense "against more than one victim." (*Id.*, subd. (e)(4).)

"This general scheme is subject to exceptions added by the Chelsea King Child Predator Prevention Act of 2010 (Stats. 2010, ch. 219, § 16) (Chelsea's Law), codified in subdivisions (j), (*l*), and (m). [Citation.] Those subdivisions prescribe increased punishments of 25 years to life or life without the possibility of parole when the prosecution has pled and proved a One Strike circumstance involving a minor victim." (*Vaquera, supra*, 15 Cal.5th at p. 713.) Pertinent here, subdivision (j)(2) mandates a sentence of 25 years to life when a person is convicted of a qualifying sex offense "under one of the circumstances specified in subdivision (e), upon a victim who is a child under 14 years of age." (§ 667.61, subd. (j)(2).)

### 2. *Due Process Right to Fair Notice*

"A defendant has a due process right to fair notice of any sentencing allegation that, if proven, will increase the punishment for a crime. [Citations.] In the sentencing enhancement context, the touchstone of fair notice is whether the accusatory pleading enables the defense to predict the sentence the defendant faces if convicted. To enable a defendant to make this prediction, an accusatory pleading must provide the defendant with fair notice of the factual basis on which the prosecution is seeking an increased

punishment and of 'the potential sentence.' " (*Vaquera, supra*, 15 Cal.5th at p. 717.)

"When the prosecution has not alleged a particular sentencing enhancement in connection with a specific count, a 'defendant is ordinarily entitled to assume the prosecution made a discretionary choice not to pursue the enhancement ... and to rely on that choice in making decisions such as whether to plead guilty or proceed to trial.' [Citation.] Since an accusatory pleading that fails to inform the defendant that the prosecution is pursuing a particular sentencing enhancement in connection with a specific count does not allow the defendant to predict the potential sentence, such a pleading does not provide fair notice." (*Vaquera, supra*, 15 Cal.5th at pp. 717–718.)

"Like a sentencing enhancement allegation, a 'One Strike allegation exposes a defendant to greater punishment than would be authorized by a verdict on the offense alone.' [Citation.] Without a true finding on a One Strike allegation, the court may not apply the lengthier sentences provided for in the One Strike law. [Citations.] Accordingly, [the Supreme Court] ha[s] held the prosecution must provide the defendant 'fair notice of the qualifying statutory circumstance or circumstances that are being pled, proved, and invoked in support of One Strike sentencing.' " (*Vaquera, supra*, 15 Cal.5th at p. 718.) "[D]ue process does not require 'rigid code pleading or the incantation of magic words.' [Citation.] An accusatory pleading need not specify the number of the pertinent sentencing statute, so long as it otherwise clearly notifies the accused of the factual basis on which it is seeking a longer sentence and the information necessary to calculate sentencing exposure." (*Id.* at pp. 719–720.) Thus, in the context of the One Strike Law, "it is sufficient for an accusatory pleading to provide the defendant fair notice of

23

the particular One Strike sentence the prosecution is seeking and of which facts it intends to prove to support that sentence." (*Id.* at p. 720.)

### 3. *Analysis*

As to each of counts 1 through 8, 10, 12, and 13, the fourth amended information included an allegation that Olaez "committed a qualifying sex offense against more than one victim as listed in Penal Code section 667.61, subdivision (e)(4)." The information did not include a standalone allegation that Olaez committed each offense under one of the circumstances specified in subdivision (e), upon a victim who is a child under 14 years of age, as specified in section 667.61, subdivision (j)(2). However, it identified the potential exposure for each count as, "15-L[ife], 25-L[ife], LWOP." Further, the relevant charges in the information, except count 10, included the victim's minor status as an element of the underlying offense. And, after the jury returned its verdicts, the People filed a sentencing brief requesting that the court impose terms of 25 years to life for each relevant count.

On appeal, Olaez argues that the trial court violated his right to due process when it imposed the punishments for counts 1 through 8, 10, 12, and 13, because the fourth amended information did not provide him with fair notice that the prosecution was pursuing sentences of 25 years to life under subdivision (j)(2) of the One Strike Law. The People assert Olaez forfeited his claim by failing to object on due process grounds at or prior to the sentencing hearing. We agree that Olaez forfeited his due process claim.

"It is well-established that a lack of notice can be forfeited by failure to object, even when it is claimed that it violated due process." (*People v. Nguyen* (2017) 18 Cal.App.5th 260, 271.) In particular, the imposition of an unpleaded sentence enhancement is an error that may be forfeited if a defendant does not object in the trial court. (*People v. Haro* (2021) 68

24

Cal.App.5th 776, 789 (*Haro*) [defendant's claim that she did not receive fair notice of unpleaded enhancement was subject to forfeiture rule, although court exercised its discretion to address argument]; *Nguyen*, at p. 272 ["It may well be that defense counsel forfeited any constitutional objection based on lack of notice in violation of due process by failing to raise it below."]; accord *People v. Houston* (2012) 54 Cal.4th 1186, 1225–1229 [defendant convicted of deliberate and premeditated attempted murder forfeited due process claim that indictment erroneously omitted allegations of deliberation and premeditation]; *People v. Toro* (1989) 47 Cal.3d 966, 975–978 [defendant charged with attempted murder forfeited fair notice claim by not objecting when court instructed jury on uncharged lesser related offense of battery with serious bodily injury], disapproved on another ground by *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3.) It is undisputed that Olaez did not interpose a contemporaneous due process objection based on his alleged lack of fair notice.[5] Therefore, his due process argument is forfeited.

Olaez contends his due process claim is cognizable on appeal, despite his failure to object, under the unauthorized-sentence exception to the forfeiture doctrine. The unauthorized-sentence exception is a " 'narrow exception' " that "applies when the trial court has imposed a sentence that 'could not lawfully be imposed under any circumstance in the particular case.' " (*People v. Anderson* (2020) 9 Cal.5th 946, 962 (*Anderson*).) The exception "is designed to provide relief from forfeiture for 'obvious legal errors at sentencing that are correctable without referring to factual findings in the record or remanding for further findings.' [Citation.] … [Citation.] Take, for example, a sentence in excess of the statutory maximum." (*Id.* at p. 962.)

---

5      Prior to sentencing, Olaez moved to represent himself in propria persona and the trial court granted the motion. Therefore, Olaez represented himself during the sentencing hearing.

The punishments imposed in the present case for counts 1 through 8, 10, 12, and 13, are not unauthorized. As the Supreme Court has explained, the imposition of "unpleaded sentence enhancements is an error of a different variety" than the imposition of an unauthorized sentence. (*Anderson, supra*, 9 Cal.5th at p. 962; see also *Haro, supra*, 68 Cal.App.5th at p. 789 [rejecting argument that imposition of unpleaded enhancement produced unauthorized sentence and concluding "this error is one that may be forfeited"]; but see *People v. Jimenez* (2019) 35 Cal.App.5th 373, 395–397 [pre-*Anderson* case addressing fair notice claim despite defense's failure to object].)

We have the discretion to excuse forfeiture. (See *Anderson*, *supra*, 9 Cal.5th at pp. 962–963; *Haro*, *supra*, 68 Cal.App.5th at p. 789.) However, our "discretion to excuse forfeiture should be exercised rarely and only in cases presenting an important legal issue." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.) We decline to excuse Olaez's forfeiture here, given that the fourth amended information included a standalone multiple-victim allegation under the One Strike Law, it alleged that the victim of Olaez's crimes (J.S.) was a minor (the additional fact giving rise to enhanced sentences under subdivision (j)(2)), and it (as well as the prosecution's sentencing brief) gave notice to Olaez that the prosecution could seek imposition of a prison term of 25 years to life for each of counts 1 through 8, 10, 12, and 13.

D. *The Prison Sentence of 275 Years to Life Plus Three Years is Not Cruel and/or Unusual Punishment*

Finally, Olaez contends his prison sentence of 275 years to life plus three years constitutes cruel *and* unusual punishment in violation of the Eighth Amendment to the federal constitution (U.S. Const., 8th Amend.), and cruel *or* unusual punishment in violation of the state constitution (Cal. Const., art. I, § 17), because it serves no legitimate penological purpose. Olaez's argument fails for two independent reasons.

26

First, Olaez did not contemporaneously object to his sentence on the ground that it constitutes cruel and/or unusual punishment. "A claim that a sentence is cruel or unusual requires a 'fact specific' inquiry and is forfeited if not raised below." (*People v. Baker* (2018) 20 Cal.App.5th 711, 720; see *People v. Speight* (2014) 227 Cal.App.4th 1229, 1247 ["A defendant's failure to contemporaneously object that his sentence constitutes cruel and unusual punishment forfeits the claim on appellate review."].) Because Olaez did not object to his sentence in the trial court, he has forfeited his argument that the sentence constitutes cruel and/or unusual punishment. (See, e.g., *People v. Brewer* (2021) 65 Cal.App.5th 199, 212; *Baker*, at p. 710; *Speight*, at pp. 1247–1248; *People v. Norman* (2003) 109 Cal.App.4th 221, 229.)

Second, Olaez's argument fails on the merits. Relying on *Coker v. Georgia* (1977) 433 U.S. 584, Olaez contends his sentence violates the federal and state constitutions because it serves no legitimate penal purpose. *Coker* recognized that punishment is excessive in relation to the crime committed, and therefore unconstitutional, "if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime. A punishment might fail the test on either ground." (*Id.* at p. 592.) Olaez bases his argument solely on the first of *Coker*'s definitions of excessive punishment.

We disagree, and instead conclude Olaez's sentence advances acceptable goals of punishment. As the U.S. Supreme Court has stated, "punishment is justified under one or more of three principal rationales: rehabilitation, deterrence, and retribution." (*Kennedy v. Louisiana* (2008) 554 U.S. 407, 420; see *People v. Ruiz* (2018) 4 Cal.5th 1100, 1107 [" '[T]he traditional aims of punishment' are 'retribution or deterrence.' "]; *In re Nunez*

27

(2009) 173 Cal.App.4th 709, 730 ["Valid penological goals include retribution, incapacitation, rehabilitation, and deterrence."].) Olaez's sentence—the functional equivalent of life in prison without the possibility of parole—clearly advances the latter two of these penological goals.

Olaez was convicted of perpetrating thirteen separate sex crimes against two minor girls over the span of three years, including forcible rape of a minor, forcible sexual penetration of a minor, forcible oral copulation of a minor, forcible lewd or lascivious acts on a minor, and forcible sexual intercourse. He took advantage of a position of trust or confidence to commit his crimes and one of his underage victims, S.S., was particularly vulnerable. Although the sentence is undoubtedly harsh, greater retribution was merited due to the severity of Olaez's numerous sex offenses and his heightened culpability. (See *People v. Christensen* (2014) 229 Cal.App.4th 781, 806 ["lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable"].) The sentence will incapacitate Olaez for the remainder of his life, ensuring he will not recidivate and prey upon other vulnerable members of society. (See *People v. Meeks* (2004) 123 Cal.App.4th 695, 709 ["California has recognized, and reasonably so, that sex offenders present a serious danger to society because of their tendency to repeat their sexual offenses."].) And his lengthy prison term may deter other potential offenders from committing similar heinous sex crimes in the future.

Further, Olaez's sentence is not cruel or unusual punishment due to the mere fact the sentence exceeds Olaez's natural life span. As Olaez notes in his appellate briefing, the late California Supreme Court Justice Stanley Mosk wrote a concurring opinion in *People v. Deloza* (1998) 18 Cal.4th 585, 600–601, in which he argued that a prison sentence serves no rational legislative purpose, and is therefore inherently cruel and unusual, where it

28

exceeds the defendant's natural life span.  However, Justice Mosk's concurrence was not the majority view of the *Deloza* court, and it carries no precedential value.  (*People v. Byrd* (2001) 89 Cal.App.4th 1373, 1383 (*Byrd*).)

In fact, courts have routinely rejected the views expressed in Justice Mosk's concurring opinion, and upheld prison sentences exceeding the natural life spans of defendants.  (See *People v. Panighetti* (2023) 95 Cal.App.5th 978, 1001–1002 [upholding sentence of 280 years to life]; *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1231 [upholding sentence of 135 years to life]; *Byrd, supra*, 89 Cal.App.4th at pp. 1382–1383 [upholding sentence of 115 years plus 444 years to life, which "serve[d] valid penological purposes"].)  As one court observed, " 'it is immaterial that defendant cannot serve his sentence during his lifetime.  In practical effect, he is in no different position than a defendant who has received a sentence of life without possibility of parole: he will be in prison all his life.  However, imposition of a sentence of life without possibility of parole in an appropriate case does not constitute cruel or unusual punishment under either our state Constitution [citation] or the federal Constitution.' "  (*Panighetti*, at pp. 1001–1002.)

Given the factors discussed above, the present case is an appropriate one in which to impose a sentence equivalent to life without the possibility of parole.

## IV
## DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

IRION, J.